**IMPERIAL SUPPLY CO., INC., PROFIT SHARING TRUST, et al., Plaintiffs,**

v.

**NORTHERN OHIO BANK et al., Defendants.**

**Civ. A. No. C 75–180.**

United States District Court, N. D. Ohio, E. D.

Dec. 13, 1976.

Avery S. Cohen, Guren, Merritt, Sogg & Cohen, Cleveland, Ohio, Byron S. Krantz, Kadish, Krantz & Weiss Co., LPA, Cleveland, Ohio, for plaintiffs.

Victor M. Javitch, Javitch & Greenwald, Cleveland, Ohio, for Elliot P. Guttenplan, Robert P. Madison and John F. Sytsma.

Ronald B. Peltz and Ronald M. Lipson, Cleveland, Ohio, for Ronald B. Peltz, Bernard L. Plechaty, Richard W. Schulz and Leon M. Worley.

Robert F. Longano, Leanza, Longano, Farina, Mendelsohn & Papandreas, Cleveland, Ohio, for Mario J. Boiardi.

Sheldon Berns, Michael H. Diamant, Kahn, Kleinman, Yanowitz & Arnson, Cleveland, Ohio, for Walter A. Zaremba.

Richard Cusick, Terrence J. Clark, Calfee, Halter & Griswold, Cleveland, Ohio, for Bernard L. Plechaty.

Robert A. Goodman, Alan N. Hirth, Benesch, Friedlander, Mendelson & Coplan, Cleveland, Ohio, for Bruce B. Felder.

Jacob I. Rosenbaum, Robert B. Haas, Burke, Haber & Berick, Cleveland, Ohio, for Peter Chernicky and Robert T. Hexter.

James T. Crowley, Thompson, Hine & Flory, Cleveland, Ohio, for Joseph W. Getzendanner, Jr.

David N. Brown, Brown & Brown, Medina, Ohio, for John J. Marquis.

Sterling Newell, Jr., Spieth, Bell, McCurdy & Newell, Cleveland, Ohio, David R. Hyde, Ada Meloy, Cahill Gordon & Reindel, New York City, for Peat, Marwick, Mitchell & Co.

Otto D. Themann, Themann, Kabaker & Bialosky, Cleveland, Ohio, for John P. Stewart, Sr.

James A. Smith, Don C. Scriven, Squire, Sanders & Dempsey, Cleveland, Ohio, for Northern Ohio Bank.

Ronald I. Weiss, Kohrman and Jackson Co., L.P.A. Cleveland, Ohio, for Willis B. Boyer, Jr. and Robert P. Madison.

Spieth, Bell McCurdy & Newell, Cleveland, Ohio, for Leon M. Worley.

Robert S. Balantzow, Nadler, Sokolsky, Bahas & Balantzow, Cleveland, Ohio, for John P. Stewart, Sr., and Otto Themann.

John R. Climaco, Climaco, Goldberg & Boukalik, Cleveland, Ohio, for John P. Stewart, Jr.

Alan Arnold, November & Arnold, Cleveland, Ohio, for Ronald B. Peltz.

John M. Widder, Cleveland, Ohio, for Michael W. McKenna.

Mark O'Neill, Cleveland, Ohio, for William W. Taft.

A. R. Mays, Cleveland, Ohio, for Richard W. Palmer.

Joseph C. Domiano, Cleveland, Ohio, for Louis A. Kastelic.

John Ritter, Sr., Coral Gables, Fla., for John Ritter.

## MEMORANDUM AND ORDER

## MOTIONS TO DISMISS

WILLIAM K. THOMAS, District Judge:

The Northern Ohio Bank (NOB), first named the Metropolitan Bank of Cleveland, began business in 1971 in the Standard Building in Cleveland, Ohio. On February 14, 1975, the bank's directors turned the bank over to the Ohio Superintendent of Banks, on the grounds that the bank was insolvent. Thereupon the Federal Deposit Insurance Corporation (FDIC) was appointed receiver for the bank; and, as receiver, it represents NOB in this case.

Since the bank's demise, a state action was filed which challenged, unsuccessfully, the Superintendent of Bank's takeover of the bank. Private actions for damages have been filed in this court by purchasers of NOB stock against different parties connected with the bank and the bank itself. The first of these private actions, filed March 3, 1975, is the present class action for "rescissional damages" which plaintiffs as stockholders of NOB bring for themselves individually and for all 500 plus stockholders (except named defendants).

Counts I through IV of the amended complaint are each based upon section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder.[1]

---

1. Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

    \*    \*    \*    \*    \*    \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the

Plaintiffs sue the bank itself, "officers and directors and/or controlling persons" of NOB, and NOB's independent auditor, Peat, Marwick & Mitchell Co. (PMM).[2] The original and amended complaint each contain a fifth count charging violations of the Ohio banking laws resulting in a diminution of the value of NOB stock. However, in their last brief plaintiffs now say that they "no longer assert rights predicated upon the violation of the Ohio Banking Laws, which are vested in the receiver." This is deemed to be a voluntary dismissal of the fifth count.[3]

Pending for decision are the plaintiffs' motion for class action certification and motions to dismiss the action filed separately by FDIC, and by defendants Chernicky and Hexter. All other defendants, except Stewart, Sr. and Marquis, who later filed separate motions and briefs, join in and adopt FDIC's motion and its grounds. Defendants' motions will be considered before reaching the class action certification motion. That motion will be considered in a separate opinion. But first principal proceedings that have led to this time of decision should be recounted.

On June 13, 1975, a case status hearing was held which all parties and their counsel were notified to attend. At this hearing plaintiffs sought and obtained leave to file an amended complaint by June 20. This

was later done. July 21 was set as a cutoff date for all motions directed to the complaint. Having filed on June 12, 1975, an earlier motion to dismiss the original complaint, the FDIC, on July 21, 1975, again moved to dismiss plaintiffs' amended complaint. Defendants Chernicky and Hexter also moved to dismiss the amended complaint. Previously on May 13, 1975, plaintiffs had moved for class action certification. At the June 13 hearing orders concerning limited discovery were entered.[4] Additionally the court's ruling on plaintiffs' motion for class action certification was stayed until the court ruled on the motions to dismiss.

Upon completion of the first briefing schedule in the fall of 1975, and after consideration of the motions to dismiss and associated briefs, the court ordered an oral hearing. It was held on January 9, 1976. At this hearing, after commenting on the "troublesome policy questions" raised in the FDIC briefs the court posed to counsel for plaintiffs:

> Query, if this were, indeed, to proceed as a class action for all 500 [stockholders] would not I just be turning this thing upside down and letting the stockholders have priority over the general creditors?

Counsel for FDIC had argued in its briefs that there were "policy considerations" (language taken from *Blue Chip Stamps v.*

---

Commission may prescribe as necessary or appropriate in the public interest.

Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practices, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

2. Jurisdiction is founded on § 27 of the 1934 Act, 15 U.S.C. § 78aa.

3. Punitive damages are not available in actions brought under Rule 10b–5. See 15 U.S.C. § 78bb; *Richardson v. MacArthur,* 451 F.2d 35, 43 (10 Cir. 1971). Therefore, since such damages could only be awarded under the state cause of action, which, as noted, plaintiffs have dropped, the second claim in plaintiffs' prayer for judgment, seeking punitive damages, is hereby ordered to be stricken from the amended complaint.

4. Upon the FDIC's obtaining assurance from the National City Bank, to which many of the liabilities (with offsetting cash assets) of NOB had been transferred at the time of the closing of NOB, that NOB records in National City's possession would be preserved, all further production of documents (except those which the FDIC agreed to produce) was stayed. The effect of this was to stay all further discovery subject to further order of the court.

*Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)) relating to "priorities" between stockholders and creditors that must be considered since "this case arises in the context of a bank liquidation." Counsel for the plaintiffs responded that the question raised by the court was really raised for the first time. He then framed the question:

Whether or not the creditors are entitled to be paid prior to the stockholders or whether or not there is just two separate statutory schemes and each proceeds at its own rate.

Later the court put a further question to plaintiffs' counsel:

If, indeed, it should be ruled that in certain respects and perhaps many respects the amended complaint is really based on the premise of an intention on the part of the defendants to mismanage the corporation, which is what the defendants are saying about your complaint, Mr. Krantz, and the court were to adopt that point of view . . . are you still saying that it is all or nothing at all; that, indeed, to that extent you agree with the defendants that your allegations are so pervasive that they not [only] go to all 500 stockholders but they go to all events that are covered by your complaint and you are not interested in any kind of a partial kind of a cause of action?

Counsel for the plaintiffs answered:

No, your Honor. If some of the allegations are inappropriate or some of the claims for relief are inappropriate to be determined in a garden variety 10b–5 action, which I don't believe this Court can find, but if that is what the Court does ultimately conclude, we would be willing to proceed with that on the basis of a class action determination.

Pursuant to a further briefing schedule settled at the hearing, plaintiffs filed a brief in response to the questions raised in the proceedings of January 9, 1976. Plaintiffs also refiled their motion for class action certification, with interlined amendments. In accordance with leave granted at the hearing, limited discovery concerning the issue of class action certification was conducted. Between March 5 and May 3, 1976, additional briefs were filed by FDIC, the plaintiffs, and other parties. These briefs related both to the motions to dismiss and the question of class action certification.

After the period provided for discovery had closed, defendant PMM, with leave of court, took the depositions of plaintiffs Howard and Judith Schoenfeld. Out of these depositions arose a motion by PMM to disqualify plaintiffs' counsel, for reasons that need not be detailed here. Following briefing consideration of that motion culminated in an oral hearing on August 20, 1976, at which this court ordered disqualification of plaintiffs' counsel.

Plaintiffs' original counsel has appealed that ruling. Pending outcome of that appeal plaintiffs have retained substitute counsel. The disqualification issue and ruling do not relate to the resolution of the pending motions.

These motions, therefore, will be decided on the basis of the briefs submitted prior to the consideration of the motion to disqualify counsel and upon the basis of various affidavits, depositions, and documentary materials made available by discovery in connection with the motion for class action certification. Although this permits some consideration of undisputed evidence outside the amended complaint, nevertheless the motions will be treated as motions to dismiss rather than motions for summary judgment.

I.

A.

Directing attention to the first and second counts, the FDIC argues:

Most of the specific allegations of wrong doing in Counts 1 and 2 involve acts of internal corporate mismanagement. These allegations generally relate not to false representations on the part of any defendant but to alleged failures to disclose material facts. Thus paragraphs 20(b)–(d) allege that the "Offering Circu-

lar" dated March 30, 1970 is materially misleading for failure to disclose that defendants intended to mismanage the bank by, *inter alia*, soliciting extraordinary loan and deposit transactions, making loans to unsavory applicants, and using stolen securities as collateral. Similarly, Paragraphs 28–31 allege generally that various bank documents failed to disclose unwise loan policies and investment decisions made by management. In essence, what defendants failed to disclose, according to these Paragraphs, were manifold breaches by defendant of their fiduciary duties and numerous examples of corporate waste, diversions of assets, and remarkably poor business judgment by ill-trained personnel—in short, a classic case of corporate mismanagement.

The FDIC further argues:

Examination of Counts 1 through 4 of the Amended Complaint reveals that plaintiffs have attempted to state what is plainly a derivative cause of action in the guise of a Rule 10b–5 suit in order to escape the requirements of Rule 23.1 of the Federal Rules of Civil Procedure [Derivative Actions by Shareholders]. When one sees this thinly veiled derivative action for what it is, it becomes unmistakably clear that plaintiffs lack standing to proceed with this litigation.

Countering, plaintiffs assert:

It does not matter that defendants' activities involved mismanagement where breach of duties which have long existed under Rule 10b–5 are present. Plaintiffs are purchasers who relied (objectively for purposes of this motion) upon statements in the prospectus and in the secondary market which were untrue or misleading. They did not get what they bargained for as a result—did not get what they were told they were getting. By purchasing, they took a chance on whether or not the Bank would progress or fail on the banking operations .stated, not on some other course of business or conduct. These operations were not implied, but openly stated. This is securities fraud; a "garden variety securities fraud," to say the least.

Plaintiffs seek to represent the entire class of purchasers of stock of NOB (except the named defendants who are in this category) who held stock in NOB at the time of its demise. In a sense it is true that a corporation is embodied in the stock held by all its shareholders. Hence there is some plausibility to the argument of defendants Chernicky and Hexter that plaintiffs' amended complaint alleges "injury to the entire body corporate by its fiduciaries." However, this can only be true if the plaintiffs and other purchasers of stock of NOB, whom the plaintiffs seek to represent as a class, have not shown in the amended complaint that they have individually suffered injury. Put another way, defendants are entitled to dismissal of the amended complaint only if they can demonstrate, as they argue, that on its face,

. . . the Amended Complaint clearly discloses that the gist of this action is grounded in the alleged mismanagement of the affairs of Northern Ohio Bank, i. e., alleged injury to the entire body corporate by its fiduciaries.[5]

---

**5.** Defendants Chernicky and Hexter concede that there are interspersed in the amended complaint,

". . . a few alleged misstatements and material omissions which Plaintiffs make an effort to distinguish from simple allegations of mismanagement such as (i) Paragraph 20(a), which alleges that the Offering Circular dated March 30, 1970 falsely stated that the Bank would pay no underwriting fees or sales commissions in connection with the sale of the common shares of Northern Ohio Bank; (ii) Paragraph 20(e), which alleges that on August 7, 1970, the Bank failed to disclose that serious questions had been

raised by various regulatory agencies which rendered the status of the application with the F.D.I.C. for insurance of deposits rather doubtful; (iii) Paragraph 20(f), which alleges that on August 7, 1970, officials of Northern Ohio Bank failed to disclose the entire circumstances surrounding the selection of its chief executive officer; (iv) Paragraph 21, which alleges that Defendants Stewart, Jr. and Northern Ohio Bank disseminated to the shareholders of Northern Ohio Bank a letter dated November 18, 1970, which contained material misstatements and omissions relating to the background and experience of Defendant Palmer and the minimum capital

In counts I, II, and IV plaintiffs assert that by reason of the specifically alleged violations of Rule 10b–5, they and each member of the class of purchasers of stock have individually suffered loss, measured by the price of their stock. Thus their claims are direct since the "injury is one to the plaintiff as a stockholder and to him individually, and not to the corporation," 13 W. Fletcher, *Corporations* § 5911 (1970). The injury is not derivative, it not appearing that the claimed injury is "to the whole body of [NOB's] stock or property without any severance or distribution among individual holders." Fletcher, *supra.*

Therefore, the claims made by the plaintiffs generally track the Rule 10b–5 claims of purchasers of stock upheld by Judge Lord in *In re Penn Central Securities Litigation,* 347 F.Supp. 1327 (E.D.Pa.1972). Significantly the fact that Penn Central was under reorganization at the time these claims were considered did not deter the court from upholding their sufficiency.

The plaintiff purchasers of Penn Central stock alleged various omissions and misrepresentations material to their decision to buy stock, both before and after the merger between the Pennsylvania and New York Central railroads. The 1968 merger had been approved by the corporations' respective shareholders long prior to the incidents alleged to form the basis of the cause of action. The merger itself was not, therefore, challenged, and no 10b–5 cause of action was available to stockholders who merely held stock and helplessly watched the merged corporation fail. The court held, however, that a cause of action was available to stockholders who bought stock between 1967 and 1970, while various misleading statements were allegedly being promulgated by the railroads with respect to the expected and subsequent success of the merged corporation. *Id.* at 1335–36.

■ Defendants are understood to be arguing that purchasers of stock of a corporation cannot press a claim for damages against directors and officers of a corporation based on Rule 10b–5 which grows out of mismanagement of the corporation when and if a corporate derivative action could be brought against any of the directors and officers based on their breaches of fiduciary duty involving the same acts of mismanagement. Under such circumstances it is argued in effect that the Exchange Act claim of a purchaser of stock cannot coexist with the corporate derivative claim. Since both types of claims are judicially created, it is appropriate to turn to court decisions to test the validity of the arguments of the defendants. Of all the federal circuits the Second Circuit by far has had the greatest experience in deciding Rule 10b–5 claims; and it is a progression of Second Circuit cases that provides the answer to the arguments of the defendants.

The first case that requires examination is *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2 Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). The case is best known for the so-called "Birnbaum rule," which Judge Augustus Hand stated as follows:

> The district court . . . viewed [Rule 10b–5] as aimed only at "a fraud perpetrated on a purchaser or seller" of securities and as having no relation to breaches of fiduciary duty by corporate insiders resulting in fraud on those who were not purchasers or sellers. We are in accord with the district court's interpretation of the Rule.

*Id.* at 462–63. The "Birnbaum rule" was approved by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores, supra.* A less well known aspect of *Birnbaum* is its dictum that section 10(b) of the Exchange Act was

> . . . directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudu-

subscriptions of Five Million Dollars ($5,000,-000) required by State regulatory authorities; and (v) Paragraph 27, which alleges certain misstatements and omissions in letters to

shareholders from Northern Ohio Bank dated January 22, 1971, December of 1971 and July of 1972.

lent mismanagement of corporate affairs.
. . .

*Id.* at 464.

Mismanagement in a Rule 10b–5 setting was again mentioned in *Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540 (2 Cir. 1967). Plaintiff Mutual and individual plaintiffs as purchasers of stock of S. H. Kress and Company based their claims in part on section 10b–5 of the Exchange Act and Rule 10b–5 thereunder. They charged defendants Genesco and Jarmon (Genesco's chairman and principal stockholder) with fraud both before and after the plaintiffs became Kress stockholders. As to the prior period the plaintiffs alleged that Genesco had, between July and October 1963, acquired 94.1% of the outstanding stock of Kress under a tender offer that was fraudulent because

> In their tender offer for the stock of Kress defendants [Genesco and Jarmon] failed to disclose (1) that Kress's real estate was worth substantially more than its financial statements indicated, and (2) their intention, after gaining control of Kress, to sell this real estate to Genesco's pension fund for an inadequate consideration, thereby raising the funds necessary to pay for the Kress stock acquisition, and otherwise to manage Kress for the sole benefit of Genesco.

*Id.* at 542. As to the fraud attributed to defendants after the date when plaintiffs became Kress stockholders, the only federal cause of action available was for injunctive relief against alleged manipulations being carried out by the defendants to force plaintiffs to sell their stock. Concerning the dismissal of this part of the claim by the trial court, the court of appeals (a panel majority) reversed and remanded.

As to the tender offer claim of fraud, Judge Feinberg, speaking for the majority, concluded that since plaintiffs relied, if at all, on the fact that "Genesco made tender offers . . . when defendants were clearly still outsiders . . . defendants' activities prior to the time when plaintiffs purchased their stock gave rise to no valid federal claim by plaintiffs." In reaching

this conclusion, among other things, Judge Feinberg first reasoned:

> As to the "hidden" value of the real estate, appellants do not allege that defendants had any information when the tender offers were made that was not equally available to other members of the public. As Judge Bonsal pointed out with regard to this "fraud," appellants benefited by purchasing their stock at allegedly depressed prices, if their allegations are to be believed. As to the concealed intention to misuse Kress, plaintiffs do not allege a misrepresentation, but failure to disclose by an outsider. At best, this claim under Rule 10b–5 is that defendants impliedly represented to the world at large that they would not mismanage Kress if they acquired control and that plaintiffs relied on this when they bought their Kress stock.

Then after distinguishing other tender offer cases, Judge Feinberg thus returned to the mismanagement discussion:

> Finally, any stockholder could plausibly argue that at the time of purchase he relied on an implied representation by management not to mismanage. Therefore, as the Commission's *amicus* brief points out, if plaintiffs' proposition were accepted, it would convert any instance of corporate mismanagement into a Rule 10b–5 case. See *Lester v. Preco Indus., Inc.*, 282 F.Supp. 459 (S.D.N.Y.1965). We regard such a result as unjustified.

*Id.* at 545. Subsequently the effect of this language of the *Genesco* case on the sufficiency of plaintiffs' count I claim (more particularly subparagraphs 20(b)(i) through (vi)) will be examined. It is enough now to stress that Judge Feinberg's quoted language from *Genesco* has not been repeated or even mentioned in any later Second Circuit cases. Indeed, in *Popkin v. Bishop*, 464 F.2d 714 (2 Cir. 1972), Judge Feinberg himself made it plain that conduct constituting mismanagement, although actionable under state law in a suit by or on behalf of a corporation, may also supply the basis for a Rule 10b–5 claim. Speaking for the *Popkin* panel, Judge Feinberg wrote:

We also recognize that assertions by a defendant that the misconduct complained of "really" amounts to "just" corporate mismanagement will not cut off a plaintiff's federal remedy. Where Rule 10b–5 properly extends, it will be applied regardless of any cause of action that exists under state law. 15 U.S.C. § 78bb; see *Vine v. Beneficial Finance Co.*, supra, 374 F.2d 627, at 635–36 (2 Cir.).

*Id.* at 718.

Recently in *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379–80 (2 Cir. 1974), cert. denied, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), the Second Circuit made it clear that the earlier quote from *Birnbaum* is not the law of that circuit. Thus it declared:

> It is well to put to rest . . . a slow-to-die contention advanced by appellees . . .—a contention first authoritatively set forth in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), *viz.*, that § 10(b) "was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs . . . ." Here, appellees tell us, all that appellant is complaining about is "corporate mismanagement," and as such is in the wrong forum. As long ago as *A. T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967), this *Birnbaum* proposition was no longer the law . . . as 10b–5 was there construed to include "*all* fraudulent schemes in connection with the purchase or sale of securities, whether . . . a garden type variety of fraud, or . . . a unique form of deception." . . .

Judge Oakes, the writer of the *Schlick* opinion, then cited with approval Judge Feinberg's language from *Popkin*, previously quoted. Immediately thereafter the court observed that the *Birnbaum* proposition was "firmly interred" by the following language of *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6,

10 n. 7, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). The Supreme Court stated that it is not "sound to dismiss a complaint merely because the alleged scheme does not involve the type of fraud that is 'usually associated with the sale or purchase of securities' " (quoting *A. T. Brod & Co. v. Perlow*, 375 F.2d at 397). The juxtaposition of the *Schlick* court's approval of the *Popkin* quotation with its reliance on *Superintendent of Insurance* shows that the *Popkin* quotation is consistent with *Superintendent of Insurance*, and with *Schlick's* further quotation from *Superintendent of Insurance* that states:

> We agree that Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement. But we read § 10(b) to mean that Congress meant to bar deceptive practices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face . . . .

507 F.2d at 380.

This court concludes, as *Schlick* shows, that Judge Feinberg's statement in *Popkin* that a Rule 10b–5 claim is not cut off by a defense charge that "the misconduct complained of 'really' amounts to 'just' corporate mismanagement" is consistent with Justice Douglas's statement in *Superintendent of Insurance* that "Congress did not seek to regulate transactions which constitute no more than corporate mismanagement." It is apparent that Justice Douglas advisedly inserted the words "no more than" before the words "internal corporate mismanagement." Thus while the Court agreed that Congress "did not seek to regulate transactions which constitute no more than corporate mismanagement," the implication is plain that if the alleged section 10(b) violation involves "more than internal corporate mismanagement," Congress sought to regulate such a transaction. Therefore, if a private party is injured in the purchase or sale of securities by actions constituting violations of Rule 10b–5, there is automatically "more than internal mismanagement."

The principal cases relied upon by the defendants are discussed in the margin.[6] None of these cases says that a federal cause of action under Rule 10b–5 is not available because a common law derivative action might be brought on the same or similar facts. It is therefore concluded that the fact that similar or identical operative facts may supply the basis for a cause of action founded upon state common law corporate fiduciary obligations of directors or officers is not relevant to and does not control the question of whether a federal Rule 10b–5 action is also available.[7]

### B.

In a more selective attack upon count I, FDIC argues that "Paragraphs 20(b)–(d) allege, at best, a non-actionable concealment by defendants of an intention to mismanage the bank." Count I in paragraph 18 charges violations of all three subparts ((a), (b), and (c)) of Rule 10b–5: employment of "devices, schemes and artifices to defraud;" making "untrue statements of material facts" or omitting "to state material facts necessary in order to make statements made, not misleading" and engaging in "acts, transactions, practices and a course of business which operated as a fraud and deceit in connection with the purchases by plaintiffs and class members of the common shares of Northern Ohio Bank." This three-branched unlawful conduct is said to include, according to paragraph 20, the preparation and dissemination of the "prospectus entitled 'Offering Circular' dated March 30, 1970, relating to the offering for sale of securities of Northern Ohio Bank, then known as the Metropolitan Bank of Cleveland."

Alleged to have been disseminated at least through December 1970, this prospectus is said to contain "misstatements, misleading statements and omissions of material fact including but not limited to the following." Subparagraphs 20(a), (b), (c), (d), (e), and (f) then follow. While FDIC and Chernicky and Hexter challenge 20(b)–(d), principally their arguments center on (b) and its items (i) through (vi):

b) Said prospectus represents under the heading "Business of the Bank" that the Bank would, *inter alia*, provide the full range of commercial banking services, would solicit and receive commercial savings deposits and make loans; and further represents that the "prime trading area" of the Bank had adequate deposit potential to ensure the viability of the

---

6. With *Genesco, supra*, defendants rely primarily upon *Lester v. Preco Industries, Inc.*, 282 F.Supp. 459 (S.D.N.Y.1965). While these cases are discussed in more detail later in the text, the following statement from *Lester*, the only case authority cited in *Genesco's* discussion of the nonactionability under Rule 10b–5 of an intention to mismanage, is pertinent here: "The ruling was that [the relevant count of the complaint] failed to state a cause of action under the Securities Laws and this would be so whether or not plaintiff had any other remedy." 282 F.Supp. at 463.

Defendants' two other principal case authorities are *Vincent v. Moench*, 473 F.2d 430 (10 Cir. 1973), and *Herpich v. Wallace*, 430 F.2d 792 (5 Cir. 1970). Neither case supports the proposition that a properly made out 10b–5 case is not maintainable because its facts also relate to "mere corporate mismanagement." In *Herpich* the court held that stockholders could not maintain a Rule 10b–5 case on their own behalf on the basis of allegations that the *corporation* had been defrauded in the course of securities transactions. Despite extensive claims that might be characterized as relating primarily to "mismanagement," the stockholders were allowed to assert a Rule 10b–5 derivative action on behalf of the corporation.

In *Vincent* plaintiffs sought to make out a 10b–5 claim on the basis that defendants had defrauded them by managing a corporation for defendant's own benefit after buying a third party's stock in order to gain a controlling interest in the corporation. Plaintiffs had also allegedly been forced to sell their interest in a subsidiary partnership to defendants at an unreasonably low price, but the court held that interest in the subsidiary, as a partnership share, was not a "security" within the meaning of the federal securities laws. Therefore, although a securities transaction with a third party was involved in *Vincent*, it had nothing to do with the partnership interest sold by the *plaintiff*. *Vincent*, therefore, is clearly inapplicable to this case.

7. Recent trial court decisions consistent with this conclusion are *King v. Sharp*, 63 F.R.D. 60 (N.D.Tex.1974), and *In re Equity Funding Corp. of America Securities Litigation*, 416 F.Supp. 161 (C.D.Cal.1976).

Bank, which representations are false and/or materially misleading and deceptive in the following respects:

i. Fails to disclose that principals of the Bank knew of and would solicit extraordinary and/or unlawful loan or deposit transactions and special arrangements and terms thereof;

ii. Fails to disclose that principals of the Bank knew of and would place loans with individual borrowers in excess of the paid-in capital, surplus and capital securities of the Bank;

iii. Fails to disclose that principals of the Bank knew of and would engage in the practice of brokered deposits by making payments either of outright cash or by paying a substantially higher interest rate for the deposit over that normally paid, with the difference being paid as compensation to the broker on the transaction, and that such practices do not constitute normal commercial banking services;

iv. Fails to disclose that loans would be made to organizations in which known felons were participants;

v. Fails to disclose that principals of the Bank would permit the use of stolen securities as collateral for loans made by it, and that such practice does not constitute normal commercial banking services;

vi. Fails to disclose that principals of the Bank would permit or direct that an abnormally high percentage of deposits of the Bank be subject to loans and in fact be loaned to customers, and that such practice does not constitute normal commercial banking services.

\* \* \* \* \* \*

Self-evaluating subparagraph (b), counsel for plaintiffs says:

Subparagraphs of the counts dealing with certain communications specify undisclosed facts which could be said to relate to intention of the defendants or their intended conduct. Paragraph 20(b)(i)–(vi) of the first count makes such allegations, i. e. that in the dissemination of the offering circular which contained specific representations concerning "Business of the Bank," the defendants "knew of" and intended to do certain things which were not disclosed. The failure to disclose an intention is the failure to disclose the fact of that knowledge and intention. . .

Assuming that the term "principals" in 20(b)(i) through (vi) is not synonymous with the count I defendants, paragraph 20 does not explicitly state that the count I defendants "'knew of' and intended to do [the itemized] things which were not disclosed." Since the amended complaint may be amended to expressly set forth the knowledge and intention of the count I defendants as just stated, for purposes of considering the motions to dismiss, paragraph 20 will be deemed to allege that the count I defendants had the stated knowledge and intent at the time the "Offering Circular" was issued by them.

FDIC argues, and in substance defendants Chernicky and Hexter make a similar argument:

Construing Paragraph 20(b)–(d) liberally in favor of plaintiffs, for example, they have, at best, alleged that they purchased bank stock in reliance on a tacit, implied representation by defendants that the bank would not be mismanaged.

FDIC then declares:

That such an allegation is not actionable under Rule 10b–5 was made clear in *Lester v. Preco Industries,* 282 F.Supp. 459 (S.D.N.Y.1965).

In *Lester v. Preco,* etc., plaintiffs, purchasers of Preco Industries stock offered publicly following registration of the offering with the Securities and Exchange Commission, brought a multicount complaint against defendant directors of Preco. While the other counts were based on various sections of the Securities Act of 1933, count IV was based on section 10 of the Exchange Act of 1934 and Rule 10b–5 thereunder. Claiming material omissions from the registration statement (prospectus), count IV recited as the omissions eight acts which it alleged "Defendants planned to and did." Judge Palmieri, citing several cases, including *Birnbaum v. Newport Steel*

*Corp., supra,* concluded first that "[e]very one of these allegations is a typical common law charge of breach of fiduciary duty in the management of a corporation, and is not normally covered by the securities laws." 282 F.Supp. at 462. As previously discussed in the treatment of *Schlick v. Penn-Dixie Cement Corp., supra,* the *Birnbaum* dictum on which Judge Palmieri's conclusion appears to be principally based has since been discarded by the Second Circuit. But it is evident that the *Birnbaum* dictum, which he followed, contributed directly to his self-posed question and the answer he gave:

> The question presented to this Court, then, boils down to whether allegations of evil intent, purportedly entertained when the registration statement was filed but not carried out until a subsequent time, are sufficient to convert what would otherwise be a stockholders derivative suit into a suit for violation of the 1934 Act. It is the conclusion of this Court that they are not.

*Id.* at 462.

This language read literally would preclude a Rule 10b–5 claim based upon a prospectus issued with a present intent to engage in specific conduct in the future that is wholly inconsistent with the representations contained in the prospectus. This interpretation of Rule 10b–5 is considered too restrictive in view of later decisions and will not be followed. Subsequent to the decision in *Lester v. Preco, etc.,* a present intention of future wrongdoing in connection with the purchase of stock was held to be a deceptive plan violative of Rule 10b–5 in *A. T. Brod & Co. v. Perlow,* 375 F.2d 393 (2 Cir. 1967). *Brod* reversed a trial court dismissal of a Rule 10b–5 complaint in which broker Brod sued its customers (the Perlows), alleging

> . . . the Perlows placed orders with various brokers and dealers to purchase securities listed for trading on the New York Stock Exchange (Exchange) with the fraudulent intent of paying for the securities only if their market value had increased by the date payment was due.

. . . The complaint further charged that the price of these securities declined by the payment date, and the Perlows, in accordance with their deceptive plan, refused to pay for the securities; . . . 375 F.2d at 395. *Superintendent of Insurance v. Bankers Life & Casualty Co., supra,* with obvious approval, cited *Brod's* application of Rule 10b–5 to prohibit the claimed "deceptive plan," and *Brod's* conclusion that

> We believe that § 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception.
>
> . . .

*Id.* at 397 (emphasis in original).

A case that recognizes that a Rule 10b–5 claim can be based upon a prospectus that deliberately misrepresents intentions is *Fox v. Prudent Resources Trust,* 382 F.Supp. 81 (E.D.Pa.1974). There it was alleged that Fox had bought a number of limited partnership shares in an oil and gas investment company that was to be managed by Prudent Resources Trust, the general partner. The prospectus made a number of representations with regard to the manner in which the investment program would be operated, including assurances that the Trust would not generally engage in self-dealing with the investment program and would derive no profit therefrom if it did. Plaintiffs alleged that profitable self-dealing did take place and that Prudent Resources Trust intended to engage in such activities while the prospectus was still being considered by the public.

Declining to dismiss the Rule 10b–5 cause of action, Judge Luongo concluded that the "*Lester* ruling" was not persuasive, since it was "strongly influenced" by the *Birnbaum* dictum, since discredited, that "10b–5 is not aimed at '"fraudulent mismanagement of corporate affairs."'" He held:

> To deny that plaintiffs have stated a cause of action under Rule 10b–5, defendants must take the position that they may concoct a plan to defraud investors, issue a prospectus to attract investment to the

plan and thereafter carry out their fraudulent scheme and yet avoid 10b–5 liability so long as they waited until the public offer was complete before breaching the promises made in the prospectus. So stated, this view of Rule 10b–5 falls of its own weight.

382 F.Supp. at 87.

FDIC further relies on *Mutual Shares Corp. v. Genesco, supra,* stating that "[a] similar result [*i. e.,* similar to *Lester v. Preco [,etc.]*] was reached in *Mutual Shares Corp. v. Genesco, Inc.*" *Genesco,* previously discussed, was decided after *Brod, supra,* in the same year (1967), yet it does not refer to *Brod.* This omission persuades this court that Judge Feinberg, writing for the *Genesco* panel, did not intend to modify the principle of *Brod* that a present intent to commit a future fraud is actionable under Rule 10b–5 when he wrote, citing only *Lester v. Preco, etc.,* in support,

> Finally, any stockholder could plausibly argue that at the time of purchase he relied on an implied representation by management not to mismanage. Therefore, . . . if plaintiffs' proposition were accepted, it would convert any instance of corporate mismanagement into a Rule 10b–5 case.

384 F.2d at 545. Moreover, this statement cannot stand as a broad preclusion of Rule 10b–5 claims where corporate mismanagement exists in view of Judge Feinberg's later statement in *Popkin v. Bishop, supra,* that "assertions by a defendant that the misconduct complained of 'really' amounts to 'just' corporate mismanagement will not cut off a plaintiff's [Rule 10b–5] remedy." 464 F.2d at 718.

What then is the surviving effect of *Genesco* on a 10b–5 claim? This question should be answered in the context of subpart (b) of Rule 10b–5, which speaks of omission "to state a material fact necessary in order to make the *statements made* . . . not misleading . . . ." (Emphasis added.) It appears from the opinion in *Genesco* that the allegedly omitted intention was not claimed to relate to any particular statement in the tender offer. Had there been any express statement in the tender offer as to the disposition of the Kress real estate, or if so, had there been any omission therefrom as to make that statement misleading, the court would surely have mentioned this in the opinion. The absence of any such statement in the tender offer led the court to thus characterize the claim of plaintiffs:

> At best, this claim under Rule 10b–5 is that defendants *impliedly represented* to the world at large that they would not mismanage Kress if they acquired control and that plaintiffs relied on this when they bought their Kress stock.

384 F.2d at 545 (emphasis added). To permit a purchaser of stock to claim he "relied on an implied representation by management not to mismanage . . . would convert any instance of corporate mismanagement into a Rule 10b–5 case," *Genesco* declared.

■ It is concluded that *Genesco* residually survives as holding that no tender offer or prospectus by its mere issuance implies a general representation that the corporation will not be mismanaged. A purchaser of stock cannot generally infer from the issuance of a tender offer or prospectus a representation that the corporation will not be mismanaged. Therefore, he cannot claim that he was misled by any such general implied representation and attempt to base a Rule 10b–5 claim thereon should any later corporate mismanagement reduce the price of his purchased stock.

*Fox,* like *Genesco,* was based on a claimed misrepresentation of intentions. However, in *Fox* the allegedly misrepresented intentions directly conflicted with explicit statements in the prospectus. Moreover, the statements in the *Fox* prospectus themselves related to what the defendants *planned* to do.

■ As seen, the first paragraph of 20(b) of the plaintiffs' amended complaint speaks of representations in the prospectus "which . . . are false and/ or materially mis-

leading and deceptive." [8] In the present case plaintiffs do not attempt to rely, as in *Genesco,* on an implied representation that the count I defendants would not mismanage the bank. Rather, as in *Fox,* the amended complaint relates the alleged omissions of wrongful intentions to specific statements in the offering circular.

It is arguable that at the time of issuance of the offering circular, and even while it remained for public consideration, it was the intention of the count I defendants, acting for themselves or through the bank's officers, to "place loans with individual borrowers in excess of the paid-in capital, surplus and capital securities of the Bank." Inclusion of this item (ii) information, omitted from the offering circular, would have rendered not misleading the prospectus statement under the heading "Business of the Bank" that it would provide "the full range of commercial banking services." Arguably this is also true of items (iii), (iv), and (v), alleging the intention to commit acts not disclosed in the prospectus:

iii. Fails to disclose that principals of the Bank knew of and would engage in the practice of brokered deposits by making payments either of outright cash or by paying a substantially higher interest rate for the deposit over that normally paid, with the difference being paid as compensation to the broker on the transaction, and that such practices do not constitute normal commercial banking services.

iv. Fails to disclose that loans would be made to organizations in which known felons were participants.

v. Fails to disclose that principals of the Bank would permit the use of stolen securities as collateral for loans made by it, and that such practice does not constitute normal commercial banking services.

It seems that each of these itemized acts, either illegal or bordering on illegality, does not fall within the "full range of commercial banking services." Hence, this statement in the prospectus would have been rendered not misleading if each of these allegedly omitted items were included in the prospectus.

One may react to such analysis by saying that no person seeking finance capital through an offering circular would have announced therein intentions to commit the illegal or suspect acts itemized in (ii) through (v), assuming the presence of such intentions. One may, therefore, read 20(b)(ii) through (v) as charging a "device, scheme or artifice to defraud" (part (a) of Rule 10b–5) or an "act, practice or course of business which operate[d] . . . as a fraud or deceit upon any person" (part (c) of Rule 10b–5), when parts 20(b)(ii) through (v) are read together with paragraph 18, whose charges track the language of Rule 10b–5(a), (b), and (c). Manifestly the present issue is not the provability of such extreme claims that the count I defendants engaged in a deceptive plan to fraudulently induce members of the public to buy NOB stock, while failing to reveal present intentions to commit future fraud. It is enough to say that if true, the allegations of 20(b)(ii) through (v) state a Rule 10b–5 (parts (a), (b), or (c)) claim.

As for subparagraph 20(b) items (i) and (vi), these are stated in terms of intentions to engage in "extraordinary and/or unlawful loan and deposit transactions" and to allow "an abnormally high percentage of deposits [to] be subject to loans and in fact to be loaned . . . ." However, it is concluded that these allegations are too general and without sufficient relationship to the statements quoted from the offering circular. To begin with, part (i) appears to be but a statement in more general terms of the practices alleged in parts (ii) through (v).

Turning to part (vi), it is doubtless a bad management practice to loan out too high a

---

8. Thus pure omissions unconnected with the prospectus are not claimed. Moreover, only in the presence of a duty to disclose the material facts that were not disclosed, a duty that may arise under the circumstances of the case as in

*Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (pure omissions as part of a scheme to defraud), may a purchaser or seller of stock make a 10b–5 claim based on pure omissions.

percentage of deposits. But since the process of making loans, and the type of loans made, which would be affected by practices such as are alleged in parts (ii) through (v), would not be affected by the loaning out of an abnormally high percentage of deposits, the court concludes that part (vi) of subparagraph 20(b) states no more than an intention to mismanage the bank, in no way related to the prospectus. Under this court's interpretation of the *Genesco* holding, *supra* at pp. 351–352, part (vi) cannot stand and will be stricken.

Finally, parts (b)(i) through (vi) will be tested by Rule 9(b), F.R.Civ.P. with regard to pleading with "particularity" "the circumstance constituting fraud." While (b)(i) and (b)(vi) lack sufficient particularity, parts (b)(ii) through (b)(v) are found to have sufficient particularity.

While the defendants do not particularize their objections to subparagraphs 20(c) and (d), these subparagraphs fall within their general attack on subparagraphs 20(b)–(d). Subparagraph 20(c) reads:

> Said prospectus further represents under the heading "Business of the Bank" that the Bank would operate in a defined "prime trading area" and that the metropolitan Cleveland area represents a healthy environment for the development and growth of the new Bank, and that downtown Cleveland and the "prime trading area" of the Bank in particular have outstanding potential for economic growth and redevelopment, which representations are deceptive and misleading in that they fail to disclose that management of the Bank knew and intended that substantial funds would be loaned to out-of-state interests . . . . .

In light of the particularity of pleading requirements of Rule 9(b), the court finds subparagraph 20(c) impermissibly general in its allegations. The statement "that the metropolitan Cleveland area represents a healthy environment for the development and growth of the new Bank," presumably the "prime trading area" that is mentioned, does not on its face preclude loans to out-of-state interests. Hence, adding such a statement to the prospectus would not have rendered the aforementioned statements of the prospectus not misleading. Even if there was a concealed intention that the loans to "out-of-state interests" would be substantial, existing at the time the prospectus was issued and outstanding, this intention without more does not show such a conflict with the quoted statements of the prospectus that inclusion of such a statement of intention would have rendered the statements made not misleading.

Subparagraph 20(d) consists of two parts. The first part concedes that the prospectus represents "that the banking business, in all phases, is highly competitive." But taking this representation in conjunction "with prior representations concerning prime trading area and represented potentials," it is said that the "highly competitive" representation "fails to disclose that extraordinary and/or unlawful conduct as specified in subparagraphs (i) through (vi) above would be undertaken so as to overcome competitive disadvantage." Even as to parts (ii) through (v) (parts (i) and (vi) having been stricken), it is concluded that the first part of 20(d) in substance but repeats those previously alleged intentional omissions. Thus duplicative, the first part of 20(d) will be stricken.

Harking back to the representation that the banking business is "highly competitive," the second part of 20(d) asserts a failure

> . . . to disclose that by reason of the existing competition and the nature of the business, the securities being offered by the Bank were highly speculative.

Because the term "highly speculative" is broad and imprecise and at least a debatable characterization of the banking business, the omission of such a term from the prospectus is not deemed sufficient to establish a Rule 10b–5 claim. Moreover, since the prospectus represented that the banking business is "highly competitive," and this is conceded to be true, the statement is not misleading. Therefore, the addition of the term "highly speculative" could not have rendered the statement "highly com-

petitive" not misleading. Finally, 20(d) is determined to lack the particularity required of a fraud claim under Rule 9(b), Federal Rules of Civil Procedure.

Subparagraph 20(a), relating to a failure "to disclose that fees and commissions would be, and were in fact, paid in connection with the distribution of securities," at this pleading stage satisfies the Rule 10b–5(b) sufficiency requirement. Likewise, subparagraph 20(e), alleging knowledge of the count I defendants that there was serious doubt as to the FDIC application, and the subparagraph 20(f) allegations that these defendants knew of "serious questions . . . raised as to the qualifications and capability" of defendant Palmer as the bank's chief executive officer, with the alleged related state-required increase of initial capitalization by $1,000,000, are determined to constitute sufficient Rule 10b–5(b) claims.

Paragraph 21 states that defendants Stewart, Jr., and NOB "prepared or caused to be prepared and disseminated to plaintiffs and other class members" a letter dated November 18, 1971, that allegedly contained misleading statements and omissions. The letter, together with an attached newspaper article, is said to be materially misleading because of its representations concerning the "enviable record" of defendant Palmer as president of Euclid National Bank without mentioning that "serious questions existed as to the previous conduct of defendant Palmer." These statements and the remaining alleged misleading statements as to the $5,000,000 total capital subscription are determined to sufficiently state a Rule 10b–5(b) claim.

## II.

### A.

Counts II, III, and IV each deal with the claimed misrepresentations of and claimed failure to disclose essentially the same information, count II in letters to shareholders, press releases, annual reports, and other public communications, count IV in reports filed with regulatory authorities, and count III with insider trading during the period of such alleged 10b–5 violations. Therefore the motions to dismiss these counts will be dealt with jointly. In addition to previously considered and determined arguments, repeated as to counts II, III, and IV, defendants assert that, as a matter of law, the amended complaint fails to show a sufficient "nexus" (the "in connection with" requirement) between the violations of Rule 10b–5 (alleged as to corporate annual reports, press releases, other public communications and reports) and the purchase of stock by the named plaintiffs. Therefore, defendants contend, these plaintiffs lack standing to sue even if Rule 10b–5 violations are conceded to have taken place. In response plaintiffs assert, in essence, that the ability to show such a relationship involves the determination of multiple questions of fact, both with regard to themselves and other class members, that cannot be resolved at this stage of the litigation. For the following reasons the court overrules the motions to dismiss counts II and IV. The motion to dismiss count III, however, is granted.

Analysis of the various legal contentions at issue here must focus on the recent Sixth Circuit case of *Fridrich v. Bradford*, 542 F.2d 307 (6 Cir. 1976). Although the direct holding of *Fridrich* is most relevant to the consideration of count III of the complaint, its reasoning also supplies the standard against which the adequacy of plaintiffs' allegations in counts II and IV must be assessed.

In *Fridrich* the district court had awarded damages to plaintiffs who sold stock in the Old Line Insurance Company without knowledge concerning pending merger negotiations that promised to offer shareholders in Old Line a substantial premium over the trading price of the company's shares.

Defendants were officers of or associated with the Bradford and Co. brokerage firm, which was the principal market maker in Old Line stock, as well as influential stockholders in Old Line in their own right. There was no question that they had violated the "disclose or abstain" doctrine by

buying Old Line shares while privy to inside information. Indeed, such a violation had already been found by the SEC, and certain compensatory remedies with regard to Old Line shareholders who had sold while defendants bought had been ordered undertaken by defendants pursuant to a consent decree between defendants and the SEC.

Relying, as plaintiffs do here, on the Second Circuit case of *Shapiro v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 495 F.2d 228 (1974), *aff'g*, 353 F.Supp. 264 (S.D. N.Y.1973), plaintiffs sought to relate the 10b–5 violations, acknowledged to have taken place, to injury to themselves. To do so they sought to show that the undisclosed information was material and that such nondisclosure was connected with their sale of stock by pointing, without more, to defendants' purchases of the stock with knowledge of the inside information during the period of nondisclosure of this information.

Refusing to follow *Shapiro*, the panel decision, written by Judge Engel (Judge Celebrezze concurring), took a "causal" approach toward the proof of injury necessary to make out a 10b–5 private damage action. Since it could not be shown that the purchase of Old Line shares by the insiders influenced plaintiffs' decision to sell their shares, the majority held that

> . . . the defendants' act of trading with third persons was not causally connected with any claimed loss by plaintiffs who traded on the impersonal market and who were otherwise unaffected by the wrongful acts of the insider.[9]

As the court put it,

> The key issue, as we see it, is not whether the proscriptions of § 10(b) and Rule 10b–5 should encompass open market

transactions, which they should, but whether the civil remedy must invariably be coextensive in its reach with the reach of the SEC, which under the Act, was designated by the Congress as the primary vehicle of its enforcement. We reject such a view where its application leads us inexorably to an unjust and unworkable result. By so extending the liability of defendants here beyond that which has already been imposed through the SEC enforcement action, we believe we would be doing violence to the intent of the statute and rule. . . .

*Fridrich v. Bradford*, 542 F.2d 307 at 320, footnotes omitted (6 Cir. 1976).

■ Turning first to count III, it is brought against defendants Zaremba, Peltz, Palmer, Northern Ohio Bank, Ritter, Felder, and Worley. Plaintiffs allege that each of these defendants had access to "information intended to be available only for corporate purposes and not for the personal benefit of any individual . . . not disclosed to plaintiffs and members of their class." Plaintiffs then say that these "material facts, more particularly described in the FIRST AND SECOND COUNTS . . . were extraordinary in nature and if disclosed would have had a substantial effect on the market price of the common shares of NORTHERN OHIO BANK." The essence of the claim of liability, based on Rule 10b–5(a), (b), and (c), is that each of the count III defendants

> [w]ith knowledge of material facts acquired as aforesaid . . . sold common shares of NORTHERN OHIO BANK in the public markets without disclosure of such material inside information and were able to achieve material advantages thereby. Said defendants

**9.** Judge Celebrezze concurred in the court's result on the grounds that the district court had gone too far by imposing liability upon the defendants for any losses sustained from the time the merger was first negotiated and its announcement, a period of about six months, whether or not the defendants traded during that time. Judge Celebrezze would limit the defendants' liability to losses sustained by plaintiffs who sold Old Line stock during the six-day period "when the Bradfords were ac-

tively purchasing Old Line stock in the over-the-counter market." He concluded that "[S]ince appellees did not sell their shares during that period [he] joined in the court's reversal of the decision below." Thus he would have allowed damages against an insider to a person trading in the impersonal market, as in *Shapiro*, but he would have limited the damages to losses sustained during the period the insider was trading without public disclosure of the inside information.

were under a duty to disclose this inside information to the investing public and to the plaintiffs and members of the class as purchasers of Northern Ohio Bank shares.

The allegations of count III do not allege any nexus between plaintiffs' purchases and the sale of stock by any of the count III defendants. Indeed, in their answer to one of defendant's interrogatories, plaintiffs state that the source of the shares they bought after the bank went into operation is "unknown." Furthermore, plaintiffs emphasize themselves the anonymous nature of the transactions in which they bought their shares in seeking certification as representatives of the class of all purchasers in this suit. *Fridrich* held

. . . the defendants' act of trading with third persons was not causally connected with any claimed loss by plaintiffs who traded on the impersonal market and who were otherwise unaffected by the wrongful acts of the insider.[10]

*Id.* at 318 (footnote omitted).

Tested by *Fridrich*, the critical question that must be considered in assessing whether the complaint states a cause of action is whether it is adequately alleged that plaintiffs were "influenced in their trading decisions by any act of the defendants." *Id.* at 321. It is not alleged that the act of selling NOB stock by the count III defendants, albeit with inside information, influenced the plaintiffs in their trading decisions.

Moreover, under *Fridrich* if the acts alleged to form the basis of defendants' liability consist of misrepresentations or omissions, to establish an implied right of action against an inside trader there must either exist a duty for the insider to reveal the information involved, as in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), or the insider, if not required to disclose the inside information, would only be liable to a purchaser or seller of stock in the open market if the insider nonetheless released misleading information. Plainly, count III does not state a claim that fits within any of these conditions. Upon the authority of *Fridrich* count III is dismissed.

### B.

■ In its first full paragraph (26), count II alleges that during the period commencing on or about January 1971, and continuing thereafter until February 1975, all the defendants committed violations of Rule 10b–5, with violations charged in the language of parts (a), (b), and (c) of the rule. Paragraph 27 says that as a part of the aforesaid unlawful conduct the defendants caused to be prepared and disseminated to plaintiffs and throughout the class "various documents . . . proxy statements, letters, annual reports, press releases and statements of condition which contained false or materially misleading and deceptive

---

**10.** In reaching this holding the court reasoned: We conclude that upon the facts of this case defendants' conduct caused no injury to plaintiffs . . . . It is undisputed that defendants did not purchase any shares of stock from plaintiffs, and that defendants' acts of trading in no way affected plaintiffs' decision to sell.
We are unable to agree with the observation of the district judge in *Shapiro* that ". . . it is the act of trading without disclosing material inside information which causes plaintiffs' injury . . . . Having breached that obligation [to abstain or disclose], the defendants are liable for plaintiffs' injuries." 353 F.Supp. 264, 278. The flaw in this logic, we conclude, is that it assumes the very injury which it then declares compensable. It does so by presupposing that the duty to disclose is absolute, and that the plaintiff is injured when the information is denied him.

The duty to disclose, however, is not an absolute one, but an alternative one, that of either disclosing or abstaining from trading. We conceive it to be the act of trading which essentially constitutes the violation of Rule 10b–5, for it is this which brings the illicit benefit to the insider, and it is this conduct which impairs the integrity of the market and which is the target of the rule. If the insider does not trade, he has an absolute right to keep material information secret. *SEC v. Texas Gulf Sulphur Co.,* [401 F.2d 833, 848 (2 Cir. 1968)]. Investors must be prepared to accept the risk of trading in an open market without complete or always accurate information. Defendants' trading did not alter plaintiffs' expectations when they sold their stock, and in no way influenced plaintiffs' trading decision. . . .
*Id.* at 318 (footnotes omitted).

statements of material facts including but not limited to" letters to shareholders, dated January 22, 1971, December 1971, and July 1972; and a statement of financial condition dated June 30, 1972.

It is alleged in (a) that the January 1971 letter spoke of the bank's FDIC application but failed to disclose conditions imposed by FDIC for approval, and in (b) that the letter reported the proposal of several persons as directors of NOB and named Arter & Hadden as the bank's general counsel but is said not to have disclosed that the proposed directors were firm partners or the amount of fees paid in connection with bank stock distribution.

In (c) the December 1971 letter, allegedly representing assets as exceeding $25,000,000 and deposits $18,000,000, is said to have been false and misleading in that "asset value was substantially below that represented" and "substantially all the deposits of the Bank were being or would be loaned and that the Bank was not liquid." In (d) it is alleged that the letter further represented that defendant Hexter was president of the bank, which is said to have been materially misleading in failing to disclose that

. . . the Bank had been compelled to remove defendant Palmer as President as a condition to obtaining FDIC insurance for deposits, and that despite his removal as President, defendant Palmer, ostensibly replaced in that capacity by defendant Hexter, continued to fully exercise the responsibilities of chief executive officer of the Bank.

Subparagraph (e) cites representations in the December letter "that the Bank would generate enough profits by the end of February, 1972, to 'wipe out' the losses generated in the early months of operations," and says that the principals of the bank, lacking a rational basis to make such a projection, knew of facts then existing that would preclude the attainment of a profitable position as represented. Subparagraph (f) of paragraph 27 cites as materially misleading a representation in the letter of December 1971 that the principals of the bank did not anticipate any large losses, and alleges that

said representation was rendered wholly misleading in that it failed to disclose that the principals knew of a course of action embarked upon with respect to loans that would produce the conclusion that large losses could be anticipated.

In (g) it is said that a letter of July 1972 to shareholders and a statement of condition as of June 30, 1972, publicly disseminated, purported to represent total assets and projected earnings in a manner said to be materially misleading for the reasons set forth in subparagraphs (c) through (f). Thus it is evident that the sufficiency of (g) is dependent on a determination of the sufficiency of (c) through (f).

At this pleading stage of the case it is concluded that the similar language found in (e) and (f), with the language of subparagraphs (a)–(d), given the most favorable construction for plaintiffs, indicates that the designated omitted information was known to the defendants (assuming that defendants were privy to the knowledge of the bank's "principals") at the time of the preparation and dissemination of the letters and the statement of financial condition. These allegations are deemed sufficient to satisfy the scienter requirement of Rule 10b–5 as declared in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

Later, consideration will be given to the nexus requirement of Rule 10b–5 as it relates generally to all the Rule 10b–5 violations claimed in count II. Taking up now the claim that the representations identified in subparagraphs (a) through (e) were materially misleading by reason of the identified omissions, the applicable test of materiality is deemed to be whether a reasonable investor in making an investment decision would attach importance to the facts omitted. This test is distilled from the Supreme Court's decision in a section 14(a) (proxy) case, *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 21, 26, 48 L.Ed.2d 757 (1976). *TSC* declares, "The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particu-

lar set of facts." *Id.* at 450, 96 S.Ct. at 2133. Accordingly, the Supreme Court ruled that it was improper for the Seventh Circuit to enter summary judgment finding materiality in *TSC.* Applying *TSC*, it likewise would be improper for this court to rule as a matter of law that the claimed omissions (a)–(f) were not material until the facts are developed.

Nonetheless it is essential now to particularly consider subparagraph (d), which relates to the letter of December 1971. If true, the claimed omissions therefrom raise a genuine issue of material fact on the issue of whether the omissions were materially misleading. Surely, if true, it would have been important to reasonable investors interested in purchasing NOB stock to know, as alleged in subparagraph (d), that defendant Palmer had been removed as president as a compulsory condition of NOB's obtaining FDIC deposit insurance, and that despite his replacement as president by defendant Hexter, defendant Palmer "continued to fully exercise the responsibilities of chief executive officer of the Bank." With-

out including this information, it was misleading to simply report, as alleged, that defendant Hexter was president of the bank.

Moving on to paragraph 28, it is first alleged

. . . with respect to each of the communications hereinabove specified, and in addition thereto, with respect to proxy statements or notices of annual meetings dated February 14, 1973 and February 22, 1974, and statements of condition and annual reports publicly disseminated and described more fully in paragraph 29 below, defendants failed to disclose material facts necessary in order to make statements made not misleading, to wit:

There follows a series of items (a) through (n), set forth in the margin.[11] Applying the reasoning and upon the grounds stated as to paragraph 27, it is concluded that these items meet requisite Rule 10b–5 pleading standards except for the items hereafter indicated, which items are stricken. These excepted items plainly relate to a state common law derivative claim but not to a

---

11. a) That "bad" loans exceeded the capital and net worth of the Bank;

b) That the Bank had loaned money to a single borrower in excess of the paid-in capital, surplus and capital securities;

c) That the Bank suffered "poor, poor, miserable management" of the Board Chairman and Former Executive Vice President;

d) That the Bank was lending moneys to members of the Board of Directors without proper authority;

e) That the officers of the Bank authorizing loans were unqualified for the positions by virtue of training and experience and that nevertheless they were authorized to lend up to Four Hundred Thousand Dollars ($400,000.00) without the approval of "anyone else" at the Bank;

f) That loans were being made without any analysis or with inadequate analysis or credit judgment and in excess of the officers' authority and/or contrary to the direction of the Board of Directors;

g) That substantially all the deposits of the Bank were being loaned and that the Bank was not liquid;

h) That substantial amounts of funds were loaned to persons who had unsavory reputations and/or criminal records, including but not limited to an individual who had been charged with embezzling millions of dollars from a corporation for which he was president;

i) That the Bank loaned a substantial amount of funds to out-of-state interests;

j) That the Superintendent of Banks from time to time questioned and challenged the stability, liquidity and loan reserves of the Bank and further questioned the ability of the Bank to continue, prior to the Bank's closing;

k) That as early as July 8, 1971, the FDIC had imposed as a condition upon the insurance of deposits of defendant NORTHERN OHIO BANK that defendant PALMER be removed as an officer and director of the Bank;

*l*) That as early as August 12, 1971, the State of Ohio had threatened to assume control of the Bank via appointment of a conservator unless FDIC insurance of deposits was obtained;

m) That defendant PALMER was ostensibly removed as President of the BANK in response to matters stated in subparagraphs k) and *l*) above, yet despite his ostensible removal as chief executive officer, defendant PALMER was retained by the Bank and its principals as a consultant at a salary of Thirty-Five Thousand Dollars ($35,000.00) per year and, in fact, continued to function as chief executive officer;

n) That as early as October, 1971, the Bank experienced material liquidity problems due to inordinately high loan-to-deposit ratio.

Rule 10b–5 claim, or it is concluded that these items are either too imprecise or violative of the particularity requirement of Rule 9(b). The stricken items are (c), (e), and (f) as to "without any analysis or with inadequate analysis or credit judgment" and items (i), (j), (*l*).

Paragraph 29 begins:

Plaintiffs allege that as a further part of the unlawful conduct as aforesaid, defendants prepared or caused to be prepared financial statements in the form of Annual Reports and/or statements of condition publicly disseminated during the years 1971, 1972, 1973 and 1974. Financial data made a part of the aforesaid Annual Reports were prepared by defendant PEAT, MARWICK & MITCHELL and certified on each occasion by said defendant as fairly presenting the financial position of defendant NORTHERN OHIO BANK as of the ending date of the respective years. Said Annual Reports and statements of condition contain misstatements of material fact or omit to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, including but not limited to the following in addition to those matters set forth in paragraph 28 above which are specifically incorporated:

There follows a series of items (a) through (h), set forth in the margin.[12] Applying the reasoning and upon the grounds stated as

to paragraph 27, it is concluded that these items meet requisite Rule 10b–5 pleading standards as previously discussed.

Paragraph 30, in its concluding sentence, states:

Defendant PEAT, MARWICK & MITCHELL knew . . . that by reason of the facts surrounding the increased loan loss reserve [recommended increase from $750,000.00 to $2,000,000.00] that prior financial statements made a part of the aforesaid Annual Reports and/or statements of condition were false and/or materially misleading and deceptive.

It is concluded that this claim meets requisite Rule 10b–5 pleading standards as previously discussed.

The final paragraph of count II that requires consideration is paragraph 31. This alleges that as a further part of the unlawful conduct, defendants on and after October 1974,

. . . with knowledge of communications already disseminated to plaintiffs and members of the class as aforesaid, and of the representations contained therein, failed to disclose additional material facts necessary in order to make statements made, in the light of the circumstances under which they were made not misleading, including but not limited to the following:

There follow items (a) through (g), set forth in the margin.[13]

---

**12.** a) Failed to disclose that the Bank had progressively lent funds to one Alex Dandy and related or affiliated companies of Alex Dandy that by January 21, 1975, totaled in excess of Three Million Dollars ($3,000,000.00);

b) Failed to disclose that a substantial percentage of loans treated as assets of the Bank were classified as of doubtful collectibility;

c) Failed to disclose any explanation of possible adverse consequences of the abnormally high loan-to-deposit ratio maintained by the Bank at pertinent times;

d) Failed to disclose the abnormally high loan concentration position of the Bank, or the adverse consequences or effects on profits thereof;

e) Failed to disclose that management of the Bank had participated in the practice of obtaining brokered deposits;

f) Failed to disclose that at various times pertinent, common control existed between the Northern Ohio Bank and Community National Bank and that Northern Ohio Bank was buying back classified loans from Community National Bank, and that such repurchases were required by the FDIC, and further failed to disclose that the effects of that requirement had created a severe restriction on new loans by the Bank and forced the calling of certain outstanding loans to maintain the Bank's liquidity;

g) Failed to disclose the existence of loan losses and adverse effects on capital adequacy;

h) Materially overstated assets of the Bank.

**13.** a) The Bank maintained an increasingly high level of classified loans;

b) The Bank maintained a heavy concentration of credit in large commercial ventures;

Applying the reasoning and upon the grounds stated in ruling upon paragraph 27, it is determined that items (f) and (g) meet the Rule 10b–5 pleading standards previously discussed. However, it is determined that items (a)–(e) are imprecise and lack the particularity required by Rule 9(b), and therefore items (a)–(e) are stricken.

Count IV charges as part of the unlawful conduct of all the defendants, *i. e.,* violations of Rule 10b–5(a), (b), and (c), that the defendants prepared or caused to be prepared and filed with public regulatory bodies (as designated) statements of financial condition and periodic reports, but not limited thereto,

> . . . which reports and documents contained false and/or materially misleading and deceptive statements of material facts all as more particularly stated in the FIRST and SECOND COUNTS of this complaint, which are specifically incorporated herein.

Defendant Peat, Marwick & Mitchell is separately charged with certifying financial data made a part of public reports and documents which contained false and/or materially misleading statements, also as more particularly stated in the first and second counts of the amended complaint.

In view of the rulings made with reference to counts I and II, count IV, which incorporates the allegedly misleading statements of counts I and II, to the extent that counts I and II have been held to contain allegations that meet Rule 10b–5 pleading standards, is similarly found to contain legally sufficient allegations. Thus counts II and IV, previously held to contain legally sufficient claims that the defendants made or caused to be made written representations that were misleading, charge violations of Rule 10b–5(a), (b), and (c).

Assuming a nexus between such Rule 10b–5 violations and purchase by plaintiffs or members of the class of NOB stock in the open market (*infra* D), any defendant responsible for issuing such misleading information would be liable for injury or loss resulting from such a violation of Rule 10b–5. In the similar context of misleading "press statements to the investment community," this is the teaching of *Heit v. Weitzen,* 402 F.2d 909 (2 Cir. 1968), which also makes it clear that under such conditions "[t]here is no necessity for contemporaneous trading in securities by insiders or by the corporation itself."

## C.

█ Insofar as applicable, Rule 9(b), providing that "in all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity," has caused this court to make indicated rulings with reference to certain portions of counts I, II, and IV. However, defendants Hexter, Chernicky, and Stewart, Sr., charged only in counts II and IV, contend that the amended complaint does not meet the standards of Rule 9(b) as applied to them individually. These defendants appear to be contending that their precise roles in perpetrating the alleged misrepresentations are not set forth with sufficient clarity. But in each instance where those who participated in the alleged acts are not specifically identified by name, *all* defendants are alleged to have "combined and conspired" in their perpetration. Furthermore, at least defendant Stewart Sr., may fall within the definition of a "controlling person," section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t, and may therefore be liable for the acts of subordinates or employees of the bank under its provisions.

Whether discovery or trial will establish the alleged fraudulent conduct and/or the alleged violations of Rule 10b–5 by these and other defendants cannot be known at this point. Since formal discovery on the merits has been stayed to date, and much of

---

c) The Bank maintained an inordinately high proportion of deposits in rate sensitive and volatile certificates of deposits;

d) The Bank had an unusually low level of small savings and checking accounts;

e) The Bank was in need of additional capital;

f) The liquidity of the Bank had been strongly criticized by the FDIC;

g) The Bank was making no further loans.

any information necessary to establish plaintiffs' allegations, if they can be established, is in the control of or within the knowledge of the defendants, the motions of these three defendants to dismiss, based on the Rule 9(b) ground, are overruled. *See Schlick v. Penn-Dixie Cement Corp., supra,* 507 F.2d at 378–79.

### D.

■ *Fridrich, supra,* emphasizes that the judicially created private right of action under Rule 10b–5 grows out of the principal of the law of torts that "[T]he disregard of the command of a statute is a wrongful act and a tort." 542 F.2d at 314, *quoting* § 286, Restatement of Torts. *See Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa. 1946). *Fridrich's* analysis provides an apt transition to plaintiffs' differentiation of the "in connection with the purchase or sale of any security" requirement of Rule 10b–5 from "causation," which they say "is not truly part of the text Rule 10b–5." Plaintiffs say that the "distinction is well demonstrated" in a passage from *Superintendent of Insurance v. Banker's Life & Cas. Co.,* 404 U.S. 6, 12–13, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971):

> The crux of the present case is that [the defrauded corporation] suffered an injury as a result of deceptive practices touching its sale of securities as an investor.

Plaintiffs thus analyze Justice Douglas's language:

> The "touching its sale" phrase relates to the "in connection with" language of the Rule, whereas the "as a result of" wording relates to the actual causation element borrowed from the law of torts.

Undoubtedly Justice Douglas used the term "touching its sale" as a figurative restatement of Rule 10b–5's "in connection with the purchase or sale of any security." This "nexus," as it has become known, between a Rule 10b–5 violation and the "purchase or sale of any security" is determined to be the statutory equivalent of the element of tort causation. Although it is gentle on the mind, the word "touching" cannot soften the need for a showing of causation.

In addition, Justice Douglas speaks of the defrauded corporation "suffer[ing] an injury as a result of deceptive practices." This adds a second element of causation but one not found in Rule 10b–5. This element of causation, as the plaintiffs say, the courts have borrowed from the law of torts. The "nexus" requirement, though statutory in origin, also properly should be treated as an element of causation. Indeed, obviously referring to the nexus requirement, *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), speaks of "the requisite element of causation in fact." Phrased differently but meaning the same thing, *Schlick v. Penn-Dixie Cement Corp., supra* at 380, first talks of "the causation question" but then divides "causation" into "transaction causation," meaning "that the violations in question caused the [plaintiff] to engage in the transaction in question," and "loss causation," meaning "that the misrepresentations or omissions caused the economic harm." As developed in the margin, proof of "transaction causation" and proof of "loss causation" vary depending on whether the Rule 10b–5 violation is of part (b) rather than parts (a) or (c).[14]

**14.** *Schlick* involved both misrepresentations and a scheme to defraud:

> In a misrepresentation case, to show transaction causation a plaintiff must demonstrate that he relied on the misrepresentations in questions when he entered into the transaction which caused him harm. 2 Bromberg § 86, at 209–11. In an omission or nondisclosure case based upon Rule 10b–5, a plaintiff need not show reliance in order to show transaction causation but must still show that the facts in question were material "in the sense that a reasonable investigator

> might have considered them important" in making his investment decisions. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–154 [92 S.Ct. 1456,.1472, 31 L.Ed.2d 741] (1972) . . . .
> Under the 10b–5 count, proof of transaction causation is unnecessary by virtue of the allegations as to the effectuation of a scheme to defraud which includes market manipulation and a merger on preferential terms, of which the proxy omissions and misrepresentations are only one aspect. Thus appellant

In their submissions both FDIC and Chernicky and Hexter point out that some of the allegedly misleading statements specified by plaintiffs in the amended complaint occurred between the time of the initial offering purchase of stock by the named plaintiffs (July 6, 1970) and the next open market purchase by Imperial Supply, on May 22, 1973. FDIC puts it:

> As for Paragraphs 20(e)–(f), 21, and 27 of the Amended Complaint, . . . plaintiffs' failure to satisfy Rule 10b–5's nexus requirement is apparent . . . . All allegations of these paragraphs pertain to alleged omissions by defendants that occurred after plaintiffs' initial stock purchases and far, far prior to any of their subsequent purchases.

With regard to the prediction in the December 1971 shareholders' letter that profits would be generated by February 1972 to wipe out the losses of early months of operation, defendants Chernicky and Hexter point out that any inaccuracy "would be public knowledge" before the May 1973 purchase of stock by a named plaintiff. Hence they argue

> . . . no nexus could possibly exist between this alleged misstatement and the Plaintiffs' purchases on and after May 22, 1973. For similar reasons, Paragraph 27(f), relating to representations in the same December, 1971 letter as to anticipated loan losses, fails to have any

conceivable nexus or connection with transactions by Plaintiffs.

Following up on this argument Chernicky and Hexter accuse plaintiffs of setting forth a "perpetual nexus" theory, under which a cause of action automatically exists on behalf of any purchaser who buys subsequent to a particular misrepresentation, until such time as the misrepresentation is "cured."

Plaintiffs counter that defendants have attributed to them a "mythical proposition." [15]

To correctly appraise the "nexus" arguments of the defendants it must be remembered that these arguments were made in conjunction with the primary argument of the defendants, now rejected, that counts I, II, and IV are merely mismanagement corporate derivative claims made in the guise of Rule 10b–5 claims. Since that argument has been rejected, and many of the allegations in count II paragraphs 28–31 relate to statements disseminated contemporaneously or nearly contemporaneously with plaintiffs' own purchases in 1973, 1974, and 1975, it is clear that a sufficient "connection" to survive a motion to dismiss has been set forth between at least *some* of the alleged "misleading" statements and plaintiffs' purchases on and after May 22, 1973.

The court has held that, if proved, the failure to reveal the intentions alleged in paragraph 20(b) will support a Rule 10b–5

---

need only show loss causation with respect to his claim for relief under 10b–5; . . . . 507 F.2d at 380–81.

The court reads *Schlick* to mean that the element of transaction causation is always present if it can be shown that the purchase or sale of a security was induced by a scheme or artifice to defraud, for causing the purchase or sale in such a situation is part of the scheme.

In a case involving misrepresentations or nondisclosures, however, inducing someone to purchase or sell a security is not the inevitable consequence of disseminating misstatements or failing to reveal material information, and therefore the connection (transaction causation) between such misstatements or omissions and the purchase or sale of a security must be independently shown.

**15.** Plaintiffs argue:

There can be no "perpetual nexus" as defendants use that term, because even before reaching the "in connection with" element, *there must be a finding of materiality as to the misstatement or omission* . . . . After [a statement's] materiality ceased, there would be no reason to consider the "nexus" element because there would be no substantive misconduct. . . . Materiality provides the natural and logical limitation on any "perpetual nexus." But if indeed the misrepresented fact remains material, as in this case where the omissions and misstatements had a continuous effect upon the market, then there is the requisite "touching" or connection with securities transactions by all persons purchasing during that period of materiality which brings them within the scope of the Rule . . . . [Emphasis in original.]

claim. As to these claims, the "connection" issue is simpler. The "Offering Circular" was disseminated by the count I defendants on or about March 30, 1970. Despite the input concerning NOB stock that plaintiff Howard Schoenfeld says he received from his friend Rudy Schor, who in turn received information from defendant Felder, the Howard Schoenfeld deposition also shows that he had read and studied the "Offering Circular" (prospectus).[16] Hence the amended complaint and the present record reveal a sufficient nexus between the Rule 10b–5 violations alleged in subparagraph 20(b) of count I and plaintiffs' first purchase of NOB stock on July 6, 1970.

As to the nexus issue that relates to subparagraphs 20(e) and (f), previously held to sufficiently state Rule 10b–5 claims, the relevant question becomes whether the named plaintiffs may represent in a class action other shareholders who bought either under the prospectus or on the open market in the period between the time of plaintiffs' initial purchases and their first open-market purchase, on May 22, 1973. That issue requires examination of the commonality, typicality, and adequacy requirements of Rule 23(a) and will be dealt with in the consideration of the motion to certify the class action.

### E.

▮ It is now the time to take up the "policy considerations" arguments of FDIC, noted but left hanging in the chronicling of the January 9, 1976, hearing, *supra* at 3–4. FDIC, in its final brief, argues:

> Plaintiffs' Responsive Brief cavalierly dismisses the policy considerations raised by the Receiver in its Reply Brief—particularly the legislative command that creditors' claims be given priority over shareholders' claims—as unworthy even of consideration in determining whether the Receiver's Motion to Dismiss is well-taken [see Plaintiffs' Responsive Brief, at e. g., 9–10]. But these policy considerations are important. Graphic proof is supplied by *Harmsen v. Smith.*

Leaving *Harmsen v. Smith* for later examination, the first part of plaintiffs' comment on the "policy considerations" argument of FDIC, to which FDIC alludes, helps to frame this issue:

> [M]atters relating to the recovery of plaintiffs in the present case and particularly the rights of creditors of Northern

16. This conclusion is supported by the following passages from Howard Schoenfeld's deposition:

Q. You are not claiming that there was any verbal misrepresentation to you.
A. No, sir.
Q. You are not claiming that information which you testified to you received through your friend Rudy from Bruce Felder—
A. Let me make something perfectly clear, to interrupt your thought.
Q. All right. Then we'll get back to my thought.
A. I used those as an incidence, and you must remember when the bank was first organized and the prospectus was mailed, that there was nothing in the prospectus per se as to growth, no growth or what. You were an investor period. So I must have been more fortunate in having Rudy know Bruce, and I'm sure other shareholders knew other directors. . . .
Q. Okay. You understand since I represent Bruce Felder, I want to know if you are suing him because you got some information over the phone from your friend Rudy.

A. No, sir.
Q. And you yourself are not claiming any verbal representations made to you?
A. No, sir.
  \*     \*     \*     \*     \*     \*
Transcript at 109–10
Q. All right. You talked to Rudy and Bruce Felder?
A. Yes, sir.
Q. What did they tell you? If you can remember. . . .
A. . . . They would send out a prospectus so that we can look at the bank prospectus. . . .
  \*     \*     \*     \*     \*   .  \*
Q. Let's ignore for a second what Metropolitan Bank did. I am just interested in what you talked to Rudy Schor and Bruce Felder about.
A. Right. "If you have equity, you are a resident of the State of Ohio, you have money to buy, buy the bank stock. We will send out a prospectus. Take it from there." And that's it.
Q. Did they talk to you about anything else?
A. That's it. Transcript at 144–45.

Ohio Bank vis-a-vis its shareholders who allege direct injury by virtue of securities fraud, cannot be the basis for, or even considered in, a ruling on a motion to dismiss. The court must find that plaintiff would be entitled to no relief at all (*Conley v. Gibson, supra*) and not merely that the relief requested might not be appropriate.

*Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), cited by plaintiffs, controls every motion to dismiss that asserts insufficiency of a complaint. The Court declared

> . . . the accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Id.* at 45–46, 78 S.Ct. at 102.

In pressing its defense of "policy considerations," FDIC seeks to gain sustenance from the Supreme Court's employment of "considerations of policy" in *Blue Chip Stamps, supra.* There, in upholding the *Birnbaum* rule (*Birnbaum v. Newport Steel Corp., supra*) which limits standing in a Rule 10b–5 action to actual purchasers and sellers, the Court concluded:

> Thus we conclude that what may be called considerations of policy, which we are free to weigh in deciding this case, are by no means entirely on one side of the scale. Taken together with the precedential support for the *Birnbaum* rule over a period of more than 20 years, and the consistency of that rule with what we can glean from the intent of Congress, they lead us to conclude that it is a sound rule and should be followed.

421 U.S. at 749, 95 S.Ct. at 1932. FDIC's argument is inapposite. In the *Blue Chip Stamps* opinion as the immediate antecedent of "what may be called considerations of policy," the Court stated:

> Given the peculiar blend of legislative, administrative, and judicial history which now surrounds Rule 10b–5, we believe that practical factors to which we have adverted [supporting the *Birnbaum* rule],

and to which other courts have referred, are entitled to a good deal of weight. *Id.* It is immediately evident that the "considerations of policy" of *Blue Chip Stamps,* limited as they are to the "practical factors" involving the *Birnbaum* rule, are unrelated to and therefore cannot serve to support the "policy considerations" argument that FDIC is presently making. "Given the peculiar blend of legislative, administrative, and judicial history which now surrounds Rule 10b–5," it is concluded and determined that these "considerations of policy" were not intended by the Court to determine the compatibility between the exclusive federal remedy of a Rule 10b–5 claim and a separate state common law corporate derivative claim. Similarly, the "considerations of policy" involving this exclusive federal remedy, of which the Court is speaking in *Blue Chip Stamps,* cannot be stretched to affect such remedy even if the claims of a purchaser of stock fall within the "claims of shareholders" to which FDIC refers when it argues: "Both federal [12 U.S.C. § 194] and state [Ohio Rev.Code § 1113.18, 19] law establish a priority for the claims of general creditors over the claims of shareholders in the context of a bank liquidation."

FDIC's argument, as seen, referred to the "[g]raphic proof . . . supplied by *Harmsen v. Smith.*" This argument can now be tested by the Ninth Circuit decision in *Harmsen v. Smith,* 542 F.2d 496, decided August 10, 1976. As the majority decision describes it the case arose "out of the insolvency of the United States National Bank of San Diego (USNB), a national banking association." The court explained:

> To understand the posture of the case on appeal it is necessary to commence with October 18, 1973, the date the Comptroller of Currency declared the USNB insolvent. On that same day the Comptroller appointed the Federal Deposit Insurance Corporation (FDIC) as receiver.

*Id.* at 498. Separate class actions involving two groups of minority stockholders were thereafter filed against the bank's directors. These actions were consolidated

into a second amended complaint, which was the subject of the appeal. The complaint alleged "violations of the federal securities laws and the National Banking Act, as well as pendent state law claims of fraud and breach of fiduciary duty." The FDIC having moved to intervene to displace the shareholder-plaintiffs, the district court ruled that "FDIC was a proper intervening party plaintiff but that the FDIC could not preclude the minority shareholders from proceeding as party plaintiffs in this action." The FDIC appealed the refusal to displace the minority shareholders.

The defendant directors of USNB appealed the decision of the district court overruling the motion to dismiss the shareholders' claim based on section 93 of the National Banking Act. However, the district court had granted the directors' motion to dismiss the Rule 10b–5 claims "on the ground that the asserted fraud did not take place in connection with the purchase or sale of any security," and no appeal was taken by the shareholders from this ruling. Expedited appeals by both FDIC and the defendant directors certified under 28 U.S.C. § 1292(b) were granted by the court of appeals.

Although the unappealed district court ruling dismissing the Rule 10b–5 claims because the shareholders were not able to assert that the fraud took place "in connection with the purchase or sale of any security" has no bearing on the motions under consideration in the instant case, the decision of the majority of the court of appeals and the views of the dissent are directly pertinent to FDIC's argument here. Section 93 of the National Banking Act (12 U.S.C. § 93), in pertinent part, provides:

If the directors of any national banking association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this chapter . . . , [s]uch violation shall . . be determined . . . in a suit brought for that purpose by the Comptroller of the Currency . . . . And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequence of such violation.

The majority was of the opinion that the right of shareholders to pursue individual claims against directors based on section 93 is controlled by *Chesbrough v. Woodworth,* 244 U.S. 72, 37 S.Ct. 579, 61 L.Ed. 1000 (1917). They concluded that "it is beyond dispute that under proper circumstances Section 93 creates a direct cause of action by the shareholders against the directors of a national bank." The Court further concluded:

Recognition of a direct cause of action pursuant to Section 93 is not precluded by the provisions of the banking law that delineate the rights and duties of the FDIC acting as a receiver upon the insolvency of a national bank. . . . An asset of a shareholder, even when it consists of a cause of action against a director of the insolvent association, is not an asset of the association of which the FDIC must take possession.[2] *See, e.*

2. Any derivative cause of action that the shareholders may have against the director is an asset of the bank, and may be pursued solely by the FDIC.

*g., Kimmich v. Potter,* 112 F.2d 135, 136 (2d Cir.), *cert. denied,* 311 U.S. 653, 61 S.Ct. 47, 85 L.Ed. 418 (1940), *reh. denied,* 313 U.S. 597, 61 S.Ct. 832, 85 L.Ed. 1550 (1941).

542 F.2d at 500–501. The court elucidated with additional language that directly contravenes FDIC's argument for dismissal of plaintiffs' Rule 10b–5 claims on the grounds of "policy considerations," advanced "in the context of a bank liquidation." The majority declared:

We realize this interpretation creates the possibility of two sets of claims against certain directors, both of which have their origin in activities related to affairs of an insolvent bank. Each set, however, is distinct from the other. The recovery with respect to one is not a recovery with respect to the other.

*Id.* at 501. Similarly in the present case, insofar as the stated 10b–5 claims are concerned, these claims are distinct from any state common law corporate derivative claim which FDIC as receiver may hereafter bring against any of NOB's directors or officers who are defendants in this case.

In dissent Judge Hufstedler agreed that section 93 of the National Banking Act . . . gives a stockholder a direct federal claim for relief against the bank's directors for their violation of the NBA to compensate him "for an injury which he, as distinct from the bank, has suffered."

*Id.* at 504. But Judge Hufstedler concluded that the minority shareholders did not sustain any injury separate from that sustained by the bank as a corporate entity. She concluded:

> Their injury stems solely from the diminution of the value of their stock caused by the directors' misdeeds. Injury of this kind is the classic example of nonpersonal injury for which the corporation alone can recover.

*Id.* With obvious recognition that the minority shareholders' Rule 10b–5 claims against the directors would have constituted exceptional cases which they could have pursued against the directors, Judge Hufstedler stated:

> The minority stockholders in our case allege nothing to bring them within any exception. They neither purchased nor sold any stock in reliance on misdeeds of the directors.

*Id.* Accordingly, it is concluded that the "policy considerations" argument of FDIC provides no ground for dismissal of the plaintiffs' counts I, II, and IV, it having been determined that these counts of the amended complaint state sufficient Rule 10b–5 claims. Thus, it becomes evident, this court's concern over the "policy considerations" argument expressed at the January 9, 1976, hearing is withdrawn, for now.

### F.

■ In a separate motion to dismiss, defendant Marquis advances a position akin to the "policy considerations" argument of FDIC, but that nonetheless requires separate consideration. He argues that the prosecution of this action will interfere with the Ohio statutory scheme for the liquidation of NOB, and therefore this court should abstain from decision herein and order plaintiffs "to repair to the state court to assert their interests under state law." Marquis advances two arguments in support of this position that have not previously been dealt with. First, he points to the plaintiffs' fourth prayer for relief:

> For an injunction providing that all persons who purchased and held common shares of stock in Northern Ohio Bank on February 14, 1975, excluding the defendants herein, recover their damages including exemplary damages in full prior to the distribution or payment of any sum, whatsoever, to any defendant, directly or indirectly, from defendant Bank
>
> . .   . .

Marquis argues that such an injunction would "interfere with the state court's administration of the receivership." This argument in effect charges a violation of the branch of the abstention doctrine that forbids the "exercise of federal review . . [when such review] should be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1245, 47 L.Ed.2d 483 (1976). *See also Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

While prayed for, plaintiffs have not pressed for such an injunction, and the thought that this court would ever consider granting such a prayer is speculative at best. Furthermore, there is no reason to believe that any distribution to a defendant will take place prior to the adjudication of the legal rights of all parties with claims against the bank. "The case in its present posture involves no issue of priority of claims [against NOB]. This case involves only the threshold question of whether a federal court has jurisdiction over the complaint filed by the petitioners . . . .."

*Tcherepnin v. Knight,* 389 U.S. 332, 346, 88 S.Ct. 548, 558, 19 L.Ed.2d 564 (1967).

Furthermore, as plaintiffs point out, this is not a case in which the issue in this federal cause of action may be adjudicated in a state court action. Under section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, the United States district courts have exclusive jurisdiction over suits for violations of the Act and rules issued thereunder. Hence, unlike plaintiffs seeking federal court adjudication of federal constitutional issues in such cases as *Burford,* which could be adjudicated by the state courts in the context of the review of state regulatory proceedings, plaintiffs here cannot "repair to the state court" to assert their federal claims.

Defendant Marquis also points out that many of the same defendants who are being sued in this action may also be sued by the FDIC, as receiver for NOB, for damage done to the corporation, and that some could be found liable in the Rule 10b–5 action but not liable to the corporation, or vice versa. Marquis asks, "[I]f this Court grants a recovery against an officer to the shareholders while the state court denies it against the same officer to the depositors and creditors, will that not . . . subvert the state scheme [of bank regulation]?" Such a result is more hypothetical than likely. But in any case it is not a ground for complaint that federal law may set a higher standard of conduct than state law, nor is there any claim made that there is a requirement under federal law that something be disclosed when state law forbids such a revelation. Abstention, therefore, is not appropriate in this case.

Upon the grounds stated, and for the reasons given heretofore, the several motions to dismiss the amended complaint pressed by FDIC and by the various defendants are overruled except to the extent that the motions, treated as Rule 12(f) motions to strike particular provisions from the amended complaint, have been granted as herein indicated.

IT IS SO ORDERED.